IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SONG C. LOPEZ-KRIST,
Individually and as Parent and Next
Friend of N.R.J-L, a minor,
    *Plaintiffs*,

   v.

RALPH T. SALVAGNO, M.D., *et al.*
   *Defendants*.

Civil Action No. ELH-12-01116

## MEMORANDUM OPINION

In this medical malpractice case, Song Lopez-Krist, individually and as parent and next

friend of her minor son N.R.J-L (the "minor"), plaintiffs, filed suit against Ralph Salvagno,

M.D.; his professional association, the Center for Joint Surgery and Sports Medicine, P.A.

("JSSM");[1] and Meritus Medical Center, Inc. ("Meritus"),[2] arising out of the above-the-knee

amputation of the minor's right leg on September 24, 2010.  *See* Complaint, ECF 1.[3]  Plaintiffs

---

[1] The parties generally refer to JSSM and Dr. Salvagno interchangeably.  Although it is not entirely clear from the record, JSSM appears to be a Professional Association owned and operated by Dr. Salvagno.  *See* Administrative and Clinical Services Contract, ECF 79-2 at 1. In any event, the relationship between JSSM and Dr. Salvagno is not relevant to the disposition of the motions at issue here.

[2] N.R.J-L received medical treatment in September 2010 at Washington County Hospital, which was operated by Meritus under its former name, the Washington County Hospital Association.  *See* Memorandum Of Law In Support of Motion for Summary Judgment ("Meritus Memo"), ECF 70-1 at 1.  In December 2010, Washington County Hospital closed and was replaced by Meritus Medical Center, which is operated by Meritus.  *See* Marie Gilbert, *Meritus Medical Center Opens, Replacing Washington County Hospital*, The Herald-Mail, Dec. 11, 2010, http://articles.herald-mail.com/2010-12-11/news/25204035_1.  The transition has no bearing on this case.

[3] Plaintiffs are citizens of West Virginia, *see* Complaint, ECF 1 ¶ 1, and defendants are citizens of Maryland.  *See* Answer, ECF 4 ¶¶ 2, 4.  As the amount in controversy exceeds $75,000, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

allege that Dr. Salvagno, an orthopedic surgeon, breached the standard of care in his treatment of N.R.J-L, and that Dr. Salvagno's negligence was the proximate cause of the amputation. *Id.* Plaintiffs also seek to hold Meritus vicariously liable for Dr. Salvagno's alleged negligence, claiming that Dr. Salvagno was the actual or apparent agent of Meritus.

Plaintiffs and Meritus have filed competing motions for summary judgment, both related to agency. Plaintiffs filed a Motion for Partial Summary Judgment on the issue of apparent authority ("Lopez-Krist Motion," ECF 68), accompanied by a Memorandum ("Lopez-Krist Memo," ECF 68-1), and exhibits. Claiming that Dr. Salvagno was an independent contractor, Meritus filed a Motion for Summary Judgment on the issues of actual and apparent authority ("Meritus Motion," ECF 70), supported by a Memorandum ("Meritus Memo," ECF 70-1), and exhibits.[4] No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I will deny both of them.[5]

## Factual Summary

### A. *Injury and Treatment*

On September 14, 2010, N.R.J-L, then a fourteen year-old boy, suffered an injury to his

---

[4] Meritus also moved for summary judgment "on the issue of direct negligence/direct liability." Meritus Memo at 1–2, 8–9. However, plaintiffs have not alleged in their Complaint or other filings that Meritus was directly liable (as opposed to vicariously liable) for negligence. *See* ECF 1, Lopez-Krist Opp. at 7 ("There is no claim now, nor has there ever been a claim by Plaintiffs, of direct negligence/direct liability against Meritus."). Accordingly, I need not discuss Meritus's "direct liability" or "direct negligence."

[5] In resolving the motions, I have also considered the Opposition filed by Meritus ("Meritus Opp.," ECF 76) to the Lopez-Krist Motion, supported by exhibits,; Lopez-Krist's Opposition to the Meritus Motion, also supported by exhibits ("Lopez-Krist Opp.," ECF 79); Lopez-Krist's Reply ("Lopez-Krist Reply," ECF 83); and Meritus's Reply ("Meritus Reply," ECF 84).

right leg. Affidavit of N.R.J-L ("N.R.J-L Aff.," ECF 68-7) ¶ 2; Patient Care Report, ECF 83-2 at 1.[6] He was transported by ambulance to the emergency room at the Washington County Hospital ("Hospital"). His mother, Lopez-Krist, arrived at the Hospital shortly thereafter. N.R.J-L Aff. ¶ 3; Affidavit of Song C. Lopez-Krist ("Lopez-Krist Aff.," ECF 68-6) ¶ 2. N.R.J-L was initially examined by Dr. John Min-Yi Lee. N.R.J-L Aff. ¶ 3; Lopez-Krist Aff. ¶ 3; Patient Care Report at 3. Dr. Lee diagnosed a proximal tibia fracture of the right leg, "neurovascular compromise,"[7] possible compartment syndrome,[8] and "[p]opliteal artery insufficiency."[9] Deposition of John Min-Yi Lee ("Lee Dep.") at 44, 57–61. Dr. Lee also noted "[p]oor sensation on the right lower extremity." *Id.* at 60. Dr. Lee ordered x-rays, which revealed that the fracture "involve[d] [the] right proximal tibial growth plate with major fragment displaced . . . [and] angulated vertically." *Id.* at 65–66. Because Dr. Lee surmised that "there could be some direct injury or compression to the popliteal artery," *id.* at 72, he contacted an "on call" orthopedic surgeon to evaluate the fracture and the possibility of a vascular issue. *Id.* at 72–74.

Dr. Lee used the call roster of orthopedic surgeons maintained by Meritus. These are doctors who are supposed to "take call" in the event an emergency room physician believes that an orthopedic consult is necessary. Deposition of Ralph T. Salvagno ("Salvagno Dep.") at 22;

---

[6] The record suggests that the injury occurred while N.R.J-L was wrestling with his friends. *See* Patient Care Report at 3. However, Meritus asserts that N.R.J-L was "intentionally assaulted." *See* Meritus Memo at 2. The discrepancy as to the underlying cause of the minor's injury, for which he sought medical treatment, is not material to the disposition of the motions.

[7] A neurovascular compromise relates to both the nervous and vascular systems. *Stedman's Medical Dictionary* (27th ed. 2000).

[8] Compartment syndrome is "the condition that results from swelling of the muscles in a compartment of a limb, which raises the pressure within the compartment so that the blood supply to the muscle is cut off." *Concise Medical Dictionary*, Oxford University Press (2010).

[9] The popliteal artery is a "continuation of [the] femoral artery" that distributes blood to the lower leg. *Stedman's Medical Dictionary* (27th ed. 2000).

Lee Dep. at 39–40. Dr. Salvagno was on that list when Dr. Lee sought an orthopedic consult. Salvagno Dep. at 73. At his deposition, Dr. Lee testified that he asked a clerk to page Dr. Salvagno using an intrahospital paging system that connected to a pager on Dr. Salvagno's belt. Lee Dep. at 41. Dr. Salvagno received a call at about 3:09 p.m., requesting his evaluation of N.R.J-L. Salvagno Dep. at 80. At the time, Dr. Salvagno was at his office in Robinwood Medical Center, which is "[t]hree or four miles" away from the Hospital. *Id.* at 73–74. Before leaving his office, Dr. Salvagno looked at an electronic version of the x-ray of N.R.J-L's leg. *Id.* at 75. Based on the x-ray, Dr. Salvagno thought that the injury "needed attention right away" because of a "potential compromise of the blood supply to that limb." *Id.* at 80–81. Dr. Salvagno arrived at the hospital at or around 3:43 p.m., *id.* at 80, at which point Dr. Lee told him that N.R.J-L had a fracture and decreased circulation in his leg. *Id.* at 85–88.

Dr. Salvagno then met with N.R.J-L and Lopez-Krist. According to Lopez-Krist and N.R.J-L, Dr. Salvagno introduced himself as an orthopedic surgeon and said that "he was going to help treat [N.R.J-L]." N.R.J-L Aff. ¶ 4; *see also* Lopez-Krist Aff. ¶ 6. Dr. Salvagno did not advise either N.R.J-L or Lopez-Krist that he was not an employee of Meritus or the Hospital. Salvagno Dep. at 16–19; *see* Lopez-Krist Aff. ¶¶ 10–11; N.R.J-L Aff. ¶¶ 6–7.

After examining N.R.J-L, Dr. Salvagno recommended "that we proceed with a reduction of the fracture," in which N.R.J-L would be anesthetized and Dr. Salvagno would attempt manually to realign the fractured bone. Salvagno Dep. at 93–94. Prior to the procedure, Lopez-Krist signed a "Consent for Procedure" on a form that contained the heading "Washington County Hospital" and the Hospital Logo. Consent, ECF 68-5 at 2.

The form stated, *id.*: "I hereby authorize Dr. _____ and _____ as his/her assistants, to perform upon _____ the following procedure(s): _____ . . . ." The name "Salvagno" was handwritten into the first blank and "Lee" was handwritten into the second. *Id.* The third blank was left empty. *Id.* The handwriting in the fourth blank is only partially legible, but appears to refer to the reduction procedure. *Id.* The form goes on to state that the "physician" explained the nature of the procedure, its benefits and risks, and the reasonable alternatives to the procedure. *Id.* The form also contains a series of declaratory statements of consent and a statement certifying that the patient or his authorized representative has read and fully understood the consent form. *Id.* Lopez-Krist signed the form, as did a witness whose name is illegible. *Id.* Dr. Salvagno signed his name in the space labeled "Physician Signature." *Id.* The form does not contain a statement explaining the nature of the contractual arrangement between Meritus and Dr. Salvagno. *See id.*

Dr. Salvagno performed the reduction and ordered another x-ray of N.R.J-L's leg. Salvagno Dep. at 95. The second x-ray revealed that the displacement had improved but was still "not anatomically perfect." *Id.* at 96. Dr. Salvagno documented that "there was an improvement in the pulses and return of sensation" to the right lower extremity, and he testified that "at this point, the reduction was satisfactory." *Id.* at 98. However, he acknowledged that while the pulses in the minor's leg had improved, they remained abnormal. *Id.* at 99–111. Dr. Salvagno planned to perform a further reduction once the swelling in the leg went down. *Id.* at 98–99.

Following the surgery, the minor was admitted to the Hospital. *Id.* at 101. Dr. Salvagno instructed the nurses to perform neurological checks on N.R.J-L and to monitor him for

symptoms of circulatory compromise and compartment syndrome. *Id.* at 101–103. However, Dr. Salvagno did not order any tests, such as a CT scan or an angiogram,[10] to evaluate the lower leg circulatory impairment, nor did he contact a vascular surgeon. *Id.* at 109, 113–116.

That night, Dr. Salvagno received a call from a nurse informing him that the nurses "were having difficulty obtaining the pulses and that [N.R.J-L] was having more pain." *Id.* at 121. The nurse also told him that N.R.J-L was unable to wiggle his toes and could only feel pressure when his toes were squeezed. *Id.* at 130. Dr. Salvagno testified that these symptoms suggested that N.R.J-L was experiencing swelling in his leg that put pressure on his nerves. *Id.* at 131–32. Later that night, Dr. Salvagno was informed that the nurses were unable to detect N.R.J-L's dorsalis pedis pulse[11] with a Doppler device, that N.R.J-L no longer could identify pressure when his toes were squeezed, and that N.R.J-L was complaining of severe pain, even with pain medication. *Id.* at 132–33. Dr. Salvagno decided to return to the Hospital and ordered the nurses to administer more pain medication. *Id.* at 133–34.

When Dr. Salvagno arrived at the Hospital that night, he examined N.R.J-L. *Id.* at 135. Dr. Salvagno was only able to obtain a posterior tibial pulse,[12] using a Doppler. *Id.* He "felt that [N.R.J-L] needed to be taken urgently to the operating room for a fasciotomy[13] because [Dr.

---

[10] An angiogram is an x-ray image of blood vessels. *Concise Medical Dictionary*, Oxford University Press (2010).

[11] The dorsalis pedis pulse is "the pulse on the top of the foot." *The Oxford Dictionary of Sports Science and Medicine*, Oxford University Press (3d ed. 2007).

[12] The posterior tibial artery is "the larger and more directly continuous of the two terminal branches of the popliteal" artery. It distributes blood to the foot. *Stedman's Medical Dictionary* (27th ed. 2000).

[13] A fasciotomy is "a procedure used to relieve or prevent compartment syndrome by incising the fascial compartment containing the muscle(s) involved and the overlying skin." *Concise Medical Dictionary*, Oxford University Press (2010).

Salvagno] felt that [N.R.J-L] had compartment syndrome." *Id.* at 135–36. After Lopez-Krist and Dr. Salvagno executed another consent form, *see* Consent at 1,[14] Dr. Salvagno performed the fasciotomy, which was intended to decrease the pressure in the muscle compartments. Salvagno Dep. at 139–40. During the procedure, Dr. Salvagno was unable to ascertain the popliteal blood supply. *Id.* at 142. Following the fasciotomy, Dr. Salvagno was still unable to detect a dorsalis pedis pulse on the top of the minor's foot. *Id.* at 141.

The next day, September 15, 2010, Dr. Salvagno again examined N.R.J-L at the Hospital. *Id.* at 172. He described N.R.J-L as "much more comfortable" and indicated that his capillary refill had improved. *Id.* N.R.J-L's posterior tibial pulse was positive by Doppler, although Dr. Salvagno still could not detect a dorsalis pedis pulse. *Id.* Nevertheless, Dr. Salvagno concluded that N.R.J-L's condition was stable and that the fasciotomy had successfully relieved the pressure on the leg muscles. *Id.* at 174.

N.R.J-L's condition worsened over the next two days and, according to the nurses' notes, his right foot became "cool, pale and mottled." *See id.* at 178. Dr. Salvagno claimed that he was not made aware of these developments until September 17, 2010. *Id.* at 180. On that date, Dr. Salvagno examined N.R.J-L and found that the swelling in his leg had increased, that his foot was "cool" and "mottled," and that the minor did not have either a posterior tibial pulse or a dorsalis pedis pulse. *Id.* at 191–92, 202. Based upon these developments, Dr. Salvagno concluded that there was either an injury to the popliteal artery or that the compartment

---

[14] Other than a different description of the procedure to be conducted, the removal of Dr. Lee's name, and the inclusion of N.R.J-L's name, the consent form was identical to the one used prior to the reduction procedure. *See* Consent at 1–2.

syndrome had recurred.  *Id.* at 194.  Dr. Salvagno then requested consultation from two vascular surgeons, Dr. William Su and Dr. Karl Riggle.  *Id.* at 196–97.

With Dr. Riggle in attendance, Dr. Salvagno conducted a wound exploration procedure, *i.e.*, a repeat fasciotomy, to determine whether there was a recurrence of compartment syndrome or injury to a blood vessel.  *Id.* at 203.  Because there was "no evidence" of "recurrent compartment syndrome," *id.* at 204, Dr. Salvagno determined that N.R.J-L had suffered a vascular injury.  *Id.* at 205–7.  Dr. Riggle then conducted an angiogram and determined that there was a laceration in N.R.J-L's  popliteal artery.  *Id.* at 208.  At some point during or after the angiogram, Dr. Su arrived and "assumed the care for the vascular portion" of the treatment.  *Id.* at 211–12.  Dr. Su conducted a vein graft bypass on N.R.J-L.  *Id.* at 213.  Although this procedure was successful in restoring blood flow, N.R.J-L's right foot "continued to be discolored with blisters and absent sensation."  Complaint ¶ 14.  N.R.J-L also continued to complain of pain in his leg over the next week, despite Dr. Salvagno's prescription of pain medication.  Salvagno Dep. at 223–24.  On September 23, 2010, Dr. Riggle "made a determination that the leg was nonviable" and he "proceeded with an above-knee amputation" on September 24, 2010.  *Id.* at 222.

### B.  *The Relationship of Meritus, Salvagno, and JSSM*

At the relevant time, the relationship between Meritus, Dr. Salvagno, and JSSM was governed by three separate documents.  The first was an Administrative and Clinical Services Contract ("ACS Contract" or "Contract"), executed by Meritus, Salvagno, and JSSM on July 11, 2007, relating to the Hospital's Center for Joint Replacement ("Center").  *See* ECF 79-2 at 1.  Pursuant to the ACS Contract, JSSM and Salvagno were to manage the administrative and

medical services provided at the Center. For example, the Contract provided that "Salvagno shall serve as Director of the Center, perform all duties and carry out all responsibilities of the Director as set forth in this Contract." *Id.* at 4. The Contract sets out a lengthy list of Salvagno's responsibilities related to the Center, including that he would "at all times provide on a non-exclusive basis Total Joint Services[15] to the reasonable satisfaction of the Hospital and the Medical Staff," and would "perform daily rounds, execute Discharge Orders and Summaries, and interface with primary care physicians and referring specialists." *Id.* at 4. Additionally, JSSM agreed to "provide full-time Total Joint Services to Hospital Patients requiring such services [and] . . . arrange for on-call coverage to cover twenty-four (24) hours per day seven (7) days per week." *Id.*

Under the ACS Contract, Meritus retained some control over the operation of the Center. For example, Salvagno's selection of doctors to work at the Center was "subject to approval by the [Meritus] Board of Directors," and Meritus "reserve[d] the right to be consulted and involved in recruitment." *Id.* Meritus also retained "control over the non-medical aspects of the management and operations of the Center." *Id.* at 12. However, the Contract provided that Meritus "shall neither have nor exercise any control or direction over the methods by which [JSSM] or Physician Employees perform Total Joint Services," and expressly provided that Dr. Salvagno and the other Center employees "shall act as Independent Contracts [sic] of Meritus." *Id.* at 11–12.

---

[15] The ACS Contract defined "Total Joint Services" as "total, partial, unilateral, bilateral or revision knee or hip surgery as defined in DRG 209, DRG 210, and DRG 471 of the Federal Register." *Id.* at 3.

Meritus and JSSM are parties to an Agreement for Trauma Coverage ("Trauma Agreement" or "Agreement"), dated July 3, 2007. ECF 79-3. It sets out the obligations of both parties in relation to JSSM's provision of services to the Hospital's trauma program. Under the Agreement, JSSM agreed "to serve as able, in conjunction with other Participants[16] to assure the continuous operation of the Trauma Program" and to "participate in an on-call roster calendar as required to maintain the Trauma Program in a mutually agreeable fashion." *Id.* at 4. Among other things, the Agreement required JSSM to assist the Hospital in developing new programs, to participate in quality review activities, to perform its obligations "in a manner reasonably acceptable to the Hospital," and to act in accordance with various professional standards. *Id.* at 5. JSSM also agreed that its employees would "respond to the Trauma Surgeon on-call within thirty (30) minutes and evaluate and treat the patient as the specialist in combination with the Trauma Surgeon as they deem appropriate." *Id.* at 4.

Notably, the Trauma Agreement also provided that Meritus "shall neither have nor exercise any control or direction over the methods by which the Physician Employees performs his [sic] Trauma Medicine Services," and that Meritus shall not "become liable for any of the existing or future obligations, liabilities or debts of [JSSM]." *Id.* at 7. Meritus was permitted to terminate the Agreement upon the occurrence of any of several events, including the "failure of Physician Employees or Participants to provide the on-call coverage requirements set forth in this Agreement." *Id.* at 9.

Meritus and Dr. Salvagno also executed a Memorandum of Understanding ("MOU"), dated June 30, 2010. ECF 79-6. The MOU was the result of several meetings between

---

[16] "Participants" is defined as "all physicians and Professional entities participating in the Trauma Program pursuant to a written Agreement for Trauma Coverage." *Id.* at 3.

"physicians, members of the Board of Directors and members of Hospital Management," in which the parties discussed "on-call coverage by members of the Medical Staff." *Id.* at 1. The MOU required Dr. Salvagno, as well as other physicians who signed similar memoranda, to provide medical services "in a timely fashion, typically within fifteen (15) minutes of receiving the request and by personal presence in the Emergency Department." *Id.* at 2. Moreover, the determination of whether Dr. Salvagno's personal presence was required "shall be made by the Emergency Department physician," and any disagreements between the Emergency Department physician and Dr. Salvagno regarding the type of medical specialty required for a patient "shall be decided by the Emergency Department physician." *Id.* at 3. In the event that Dr. Salvagno failed to satisfy the terms of the MOU, he would not receive any payment "for the entire call day in question." *Id.*

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).

In other words, the non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby*, 477 U. S. at 247-48 (emphasis in original).

In resolving a summary judgment motion, the court may not make credibility determinations. *Black & Decker Corp. v. United States*, 436 F. 3d 431, 442 (4th Cir. 2006). Moreover, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted), *cert. denied*, 540 U.S. 822 (2003). "Both motions must be denied

if the court finds that there is a genuine issue of material fact.  But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment."  10A Wright, Miller, & Kane, *Federal Practice & Procedure* § 2720, at 336–37 (3d ed. 1998, 2012 Supp.)

## Discussion[17]

Plaintiffs allege that Dr. Salvagno acted as an agent of Meritus when he provided medical treatment to N.R.J-L, and that he was clothed with apparent authority.  Meritus disagrees, arguing that Dr. Salvagno was an independent contractor.  It also maintains that the Hospital did not confer actual or apparent authority upon Dr. Salvagno.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."  Restatement (Second) of Agency § 1 (1958); *see Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 564, 952 A.2d 304, 321 (2008); *Faith v. Keefer*, 127 Md. App. 706, 739, 736 A.2d 422, 440 (1999), *cert. denied*, 357 Md. 191, 742 A.2d 521 (1999).  A person may be deemed an agent based on actual authority or apparent authority.  *Jackson*, 180 Md. App. at 565, 952 A.2d at 322.

Ordinarily, "the question of the existence of the agency relationship is a factual matter and *must* be submitted to the jury."  *Green v. H & R Block, Inc.*, 355 Md. 488, 504, 735 A.2d 1039, 1048 (1999) (emphasis added); *see Faya v. Almaraz*, 329 Md. 435, 460, 620 A.2d 327, 339

---

[17] The law of the forum state, Maryland, guides this Court's choice-of-law analysis.  *See CACI Int'l., Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009).  Because the alleged injury occurred in Maryland, I look to Maryland law in this diversity case.  In tort cases, Maryland courts apply *lex loci delicti*, *i.e.*, the law of the "place of the alleged harm."  *See Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).

(1993); *P. Flanigan & Sons v. Childs*, 251 Md. 646, 653, 248 A.2d 473, 476 (1968) (recognizing that the existence of an agency relationship is ordinarily a question of fact); *Levine v. Chambers*, 141 Md. 336, 343, 118 A. 798 (1922) ("[I]t is not for the court to determine the question of agency *vel non,* but if the testimony as to the fact of the agency tends to prove the existence of that relation, it should be submitted to the jury, who are the exclusive judges of its weight."); *Jackson*, 180 Md. App. at 564, 952 A.2d at 321. Moreover, the burden of proving an agency relationship rests on the party who seeks to rely on it. *Homa v. Friendly Mobile Manor, Inc.*, 93 Md. App. 337, 359, 612 A.2d 322, 333 (1992).

As noted, plaintiffs argue that Salvagno was an agent of Meritus on theories of both actual and apparent authority. However, they have moved for summary judgment only on the question of apparent authority. Meritus has moved for summary judgment on the grounds of both actual authority and apparent authority. It maintains, *inter alia*, that plaintiffs failed to identify in response to interrogatories any "facts, documents and/or witnesses" to support their agency claim. Moreover, Meritus contends that, even considering the evidence on which plaintiffs rely, there is no genuine dispute of material fact on the question of Salvagno's agency *vel non*.

### Plaintiffs' Answer to Interrogatories

As a preliminary matter, I must first address Meritus's contention that plaintiffs cannot rely on a claim of agency because of alleged discovery violations.

In support of their argument that Dr. Salvagno was an agent of Meritus, plaintiffs proffer three documents outlining the professional relationship between Salvagno, JSSM, and Meritus, affidavits from Lopez-Krist and N.R.J-L, and the medical consent forms. Meritus argues that

plaintiffs' response to the relevant interrogatory was devoid of any factual content related to agency and that the affidavits appended to plaintiffs' motion were never disclosed during discovery. *See* Meritus Memo at 5.

Specifically, Meritus notes that it propounded Interrogatory 3, which said: "State the identity . . . of each and every individual that you allege was the actual and/or apparent agent, servant and/or employee of Meritus who Plaintiffs will allege was negligent at trial . . . ." *See* Interrogatories, ECF 70-3 at 2. In their response to Interrogatory 3, plaintiffs stated that "each of the individuals named as Defendants in the suit were agents and/or apparent agents of Meritus." Interrogatories at 3. In Interrogatory 4, Meritus stated: "If you will contend there is any act of negligence or breach of standard of care on the part of Meritus *independent of* any acts of one or more of the individuals listed in answer to Interrogatory No. 4 [sic], specify in detail each such act of negligence . . . ." *Id.* (emphasis in original). Plaintiffs' response to Interrogatory 4 stated, *id.* at 3–4:

> **ANSWER NO. 4**: Objection. This request calls for a medical legal conclusion. This has been addressed by Plaintiffs' experts in their reports which have been provided to counsel and which are incorporated herein by reference. The deposition testimony of each of Plaintiffs' expert witnesses is incorporated herein by reference. As discovery is ongoing this Answer may be supplemented.

Meritus also propounded Interrogatory 5, which asked: "For each individual identified in answer to Interrogatory Nos. 3, and 4 please specifically list all facts, documents, and/or witnesses who support your contention that the individual(s) is the real and/or apparent agent, servant and/or employee of Meritus." Interrogatories at 3. Plaintiffs' response to Interrogatory 5 was as follows: "See Answer No. 4." *Id.*

The depositions and reports to which plaintiffs referred in Answer 4 did not contain facts regarding Dr. Salvagno's employment or agency relationship to Meritus. Moreover, Meritus complains: "Discovery is now closed and this Answer was never supplemented. Accordingly, no facts were provided in support of agency. No fact witnesses were identified in support of agency. There was no indication what Plaintiffs did or did not believe regarding Dr. Salvagno's employment status." *Id.*

Regarding the Lopez-Krist and N.R.J-L Affidavits, which were attached to the Lopez-Krist Motion, Meritus states in its Reply, at 8:

> As already noted, Plaintiffs do not dispute and offer no excuse for their failure to provide the information contained in their Affidavits in response to proper Interrogatory [sic]. Plaintiffs cannot dictate to Meritus what discovery method is used to elicit the basis for any claim. In this case, the Interrogatory seeking a listing of all facts that Plaintiffs would use to support their claim of apparent agency was clear and unambiguous. Plaintiffs' response to the Interrogatory leads one to conclude that Plaintiffs would not, and could not, mount a claim of apparent agency. It is undisputed that these facts should have been disclosed in response to the Interrogatory during discovery, when an investigation could have been undertaken.

In short, Meritus argues that plaintiffs may not rely on evidence they did not cite in their answer to Interrogatory No. 5, and because they did not cite any evidence of an agency relationship in their answer or indicate that affidavits were forthcoming, no evidence as to agency is properly before the court. Accordingly, Meritus maintains that it is entitled to summary judgment.

In response, plaintiffs state, Lopez-Krist Reply at 2 n.1:

> Meritus' argument that Plaintiffs' Affidavits were improperly "withheld" evidence is a reach. (Doc. 76, p. 3–4). Surely, at the outset of the case Meritus was aware that the only claim against it was a vicarious liability claim, as no direct negligence action has ever been brought against Meritus. *See* Plaintiffs' Complaint (Doc. 1). In addition, all fact and expert witnesses have been deposed.

> If Meritus had any questions or concerns on the topic of vicarious liability, it was free to ask questions.

A party is "not required to plan a defense based on all possible documents or information presented during depositions, but rather must be adequately informed by the opposing party, in response to proper discovery requests, which facts, theories, and documents will likely be relied upon at trial." *Contech Stormwater Solutions, Inc. v. Baysaver Technologies, Inc.*, 534 F. Supp. 2d 616, 625 (D. Md. 2008), *aff'd*, 310 F. App'x 404 (Fed. Cir. 2009). Accordingly, a party "who has responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). In order to enforce this Rule, Fed. R. Civ. P 37(c)(1) provides that a party who fails to provide information in response to an interrogatory may not use that information to supply evidence on a motion, unless the failure was substantially justified or is harmless. *Id.*; *see Contech Stormwater Solutions*, 534 F. Supp. 2d at 622–23; 8B Wright, Miller, and Marcus, *Federal Practice and Procedure* § 2179 (3d ed. 2010). The exclusion sanction "provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56." Fed. R. Civ. P. 37 Advisory Committee Note (1993); *see Osunde v. Lewis*, 281 F.R.D. 250, 258 (D. Md. 2012).

As noted, exclusion is improper if the nondisclosure of evidence was substantially justified or harmless. The court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c) (1) exclusion analysis." *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). In making this determination, the Court is guided by the following factors: "(1) the

surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* The first four factors relate to the harmlessness exception. *Id.*

As a threshold matter, I agree with Meritus that plaintiffs' response to Interrogatory 5 was deficient, as it did not identify any "facts, documents, and/or witnesses" supporting plaintiffs' contention that Salvagno was an agent of Meritus. Moreover, plaintiffs' asserted justification for their failure to supplement their answers—namely, that Meritus "was free to ask questions"—is unsatisfactory. Nevertheless, plaintiffs' nondisclosure was harmless.

Regarding the three agreements between Meritus and Dr. Salvagno, Meritus cannot convincingly argue that it was surprised by plaintiffs' reliance on them. Without question, Meritus knew of the agreements, as they are a party to them. Moreover, the agreements were the subject of deposition testimony. *See* Salvagno Dep. 52–56. And, Meritus could have anticipated that the agreements would be central to plaintiffs' argument regarding actual agency. It is also salient that allowing the evidence will not delay the trial, as no trial date has yet been set. *See, e.g.*, *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 377 (D. Md. 1999) (holding that where trial has not been scheduled, there is no prejudice to warrant the drastic remedy of exclusion). Finally, the evidence is of the utmost importance to plaintiffs' argument regarding actual authority, making exclusion a particularly harsh and inappropriate sanction. Accordingly, I will consider the three agreements in ruling on the motions.

With respect to the Lopez-Krist and N.R.J-L affidavits, Meritus is not persuasive in arguing that it was surprised by plaintiffs' use of this evidence. In the first instance, Ms. Lopez-

Krist was deposed, and her affidavit is largely duplicative of the deposition testimony. The affidavits contain statements by Lopez-Krist and N.R.J-L that, at the Hospital, Dr. Salvagno introduced himself as an orthopedic surgeon but did not clarify that he was not an employee of the Hospital. *See* Lopez-Krist Aff. ¶¶ 6–8, 10; N.R.J-L Aff. ¶¶ 4–7. At her deposition, Lopez-Krist testified to essentially the same information, *see* Lopez-Krist Dep. at 161–62, and so Meritus certainly cannot claim surprise. And, Dr. Salvagno testified consistently with the affidavits at his own deposition, admitting that he generally did not advise patients that he was "a private doctor with a separate medical office." Salvagno Dep. at 23–24. Moreover, defendant presumably had every opportunity to question Lopez-Krist.

In addition, any claim of unfair surprise is belied by the contents of the Meritus Memo. In its Memo, Meritus expressly addressed the probative force of statements that Dr. Salvagno made to Lopez-Krist, asserting: "It is important to note that it is the conduct of the hospital, not Dr. Salvagno that determines this issue . . . Not every encounter with a doctor within the four walls of a hospital permits an issue of apparent agency to go to the jury." Meritus Memo at 13. As noted above, consideration of the evidence will not disrupt trial, and although the evidence is somewhat duplicative of Lopez-Krist's deposition testimony, it is essential to plaintiffs' case. Accordingly, I will consider the affidavits.

### Actual Authority

Actual authority exists when "the principal knowingly permits the agent to exercise the authority or holds out the agent as possessing it." *Homa*, 93 Md. App. at 360, 612 A.2d at 333. Actual authority may be express or implied. *Medical Mut. Liab. v. Mutual Fire*, 37 Md. App. 706, 712, 379 A.2d 739, 742–43 (1977) ("The relation of principal and agent does not

necessarily depend upon an express appointment and acceptance thereof, but it may be implied from the words and conduct of the parties and the circumstances."); *see also Heslop v. Dieudonne,* 209 Md. 201, 206, 120 A.2d 669, 671–72 (1956). Moreover, an actual agency relationship may be established by either written agreement or inference. *Patten v. Board of Liquor*, 107 Md. App. 224, 238, 667 A.2d 940, 947 (1995); *see Citizens Bank of Maryland v. Maryland Indus. Finishing Co.*, 338 Md. 448, 459, 659 A.2d 313, 318 (1995) ("Actual 'authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" (quoting Restatement (Second) of Agency § 26)).

In Maryland, a principal may, in some circumstances, be "'liable to third persons in a civil suit, for the . . . torts, negligences, and other malfeasances, or misfeasances, and omissions of duty of his agent . . . .'" *Sanders v. Rowan*, 61 Md. App. 40, 54, 484 A.2d 1023, 1030 (1984) (citations and some internal quotation marks omitted). This doctrine of vicarious liability is commonly referred to as *respondeat superior*, and typically arises in the employment context. *See Southern Mgmt. Corp. v. Taha*, 378 Md. 461, 481, 836 A.2d 627, 638 (2003) ("On a successful claim under the doctrine of respondeat superior, an employer will be held jointly and severally liable for the tortious acts committed by its employee."); *Barclay v. Ports Am. Balt., Inc.*, 198 Md. App. 569, 577–78, 18 A.3d 932, 937 (2011) ("[T]he doctrine of *respondeat superior* . . . holds an employer vicariously—and jointly and severally—liable for the tortious conduct of an employee, where it has been shown that the employee was acting within the scope of the employment relationship at that time.").

Generally speaking, a principal is vicariously liable for the negligence of another when the two share a master-servant or employer-employee relationship, but not if the other is merely an independent contractor of the principal.[18] *Hunt v. Mercy Med. Ctr.*, 121 Md. App. 516, 545, 710 A.2d 362, 376 (1998); *Sanders*, 61 Md. App. at 51, 484 A.2d at 1028. There are, however, different "species" of independent contractor: those who are agents and those "from an entirely separate genus of 'non-agents.'" *Brooks v. Euclid Sys. Corp.*, 151 Md. App. 487, 517, 827 A.2d 887, 904, *cert. denied,* 377 Md. 276, 833 A.2d 31 (2003). In the taxonomy of agents, employee/servants, and independent contractors, a "'master is a species of principal and a servant is a species of agent.'" *H & R Block, Inc.*, *supra*, 355 Md. at 509, 735 A.2d at 1051 (quoting Restatement (Second) of Agency § 2 cmt. a). Put another way, "all masters are principals and all servants are agents, but only when the level of control is sufficiently high does a principal become a master and an agent a servant." *H & R Block, Inc.*, 355 Md. at 509, 735 A.2d at 1051. The Court posited in *Brooks*, 151 Md. App. at 517, 827 A.2d at 904: "'Agents who are not servants are regarded as independent contractors.'" *Id.* (quoting *Sanders*, 61 Md. App. at 50, 484 A.2d at 1028).

The distinction between a servant and an independent contractor lies in the degree of control exerted by the employer. *Danner v. Int'l Freight Sys. of Washington, LLC*, 855 F. Supp. 2d 433, 454–55 (D. Md. 2012) (applying Maryland law). In *Balt. Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 387, 780 A.2d 303, 315–16 (2001), the Maryland Court of Appeals said: "'[T]he test in determining whether a person is a servant or an independent contractor is whether the

---

[18] For vicarious liability to attach, "the offending conduct [must have] occurred within the scope of the employment of the servant or under the express or implied authorization of the master. *Cox v. Prince George's Cnty.*, 296 Md. 162, 165, 460 A.2d 1038, 1039 (1983). Meritus does not argue that Salvagno was acting outside the scope of his responsibilities.

employer has the right of control over the employee in respect to the work to be performed.'" (citation omitted). Similarly, in *Kersten v. Van Grack, Axelson & Williamowsky, P.C.*, 92 Md. App. 466, 608 A.2d 1270 (1992), the Maryland Court of Special Appeals explained that "'the decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.*'" *Id.* at 469–70, 608 A.2d at 1272 (citation omitted) (emphasis in original); *see also Hunt*, 121 Md. App. at 545, 710 A.2d at 376 ("The ultimate test for whether an agent is also a servant is control . . . ."). In other words, a "servant is a person who is employed to perform . . . services for another . . . and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control." *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 581–82, 119 A.2d 423, 427 (1956); *accord H & R Block, Inc.*, 355 Md. at 508–09, 735 A.2d at 1050–51.

Conversely, an independent contractor is generally "'free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for whom the work is being done.'" *Baltimore Harbor Charters, Ltd.*, 365 Md. at 387 n.15, 780 A.2d at 316 n.15 (citation omitted). Notably, "'[t]he reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the execution of his duties.'" *Brooks*, 151 Md. App. at 510, 827 A.2d at 900 (quoting *Schweizer v. Keating*, 150 F. Supp. 2d 830, 840 (D. Md. 2001)); *see Danner*, 855 F. Supp. 2d at 455.

Meritus argues that it did not have sufficient control over Dr. Salvagno to create a master-servant relationship. In particular, Meritus notes that it "does not control how Dr. Salvagno is to manipulate his hands during surgery. Meritus does not control the medical and treatment decisions Dr. Salvagno makes during the care of his patients. Dr. Salvagno makes medical decisions and orthopedic judgments without direct hospital supervision, as it requires a high degree of specialized skill and training." Meritus Memo at 11.

Plaintiffs counter that the three contracts that define the professional relationship between Dr. Salvagno and Meritus establish "a complex relationship between the parties in which [Meritus] confers actual authority on Dr. Salvagno for Dr. Salvagno to act on behalf of [Meritus] for its benefit, and subject to its 'control.'" Lopez-Krist Opp. at 13. Specifically, plaintiffs claim that Meritus is contractually entitled to control over, *inter alia*, the dates when Dr. Salvagno is "on call," how long Dr. Salvagno has to respond to a call, whether Dr. Salvagno's personal presence is necessary for treatment of a patient, and the medical specialty required for treatment of an Emergency Department patient. *Id.* at 17–18. Moreover, plaintiffs argue that Meritus has the contractual right to "determine whether Dr. Salvagno satisfactorily fulfilled his on-call coverage during any month and [to] withhold payment for the entire on-call day," and the right to determine whether Dr. Salvagno "was using 'his best efforts to achieve or maintain any of the expectations,' and unilaterally decide to forfeit 'all or a portion of' that contract year's per diem earnings." *Id.* at 19.

In its Reply, Meritus disputes the inferences plaintiffs seek to draw from the contracts. The Hospital argues that the ACS Contract is irrelevant, as N.R.J-L was not seen in the Center for Joint Replacement, nor were any of his joints replaced. Meritus Reply at 3. Regarding the

other two contracts, Meritus argues that they merely set out administrative parameters and ensure that Dr. Salvagno satisfies state and federal standards of general competency. *Id.* at 4. According to defendant, "all of the orthopedic care and decisions that were provided to N.R.J-L were expressly left to Dr. Salvagno's sole discretion." *Id.* at 5.

The contractual relationship permitted Dr. Salvagno to practice medicine with some degree of autonomy, but it also granted Meritus some control over Dr. Salvagno's practice. While Dr. Salvagno appeared to have control over most medical decisions, Meritus retained the ability to control his schedule to some extent and to overrule his decisions in particular circumstances. Whether Meritus had sufficient control over Dr. Salvagno to create a master-servant relationship is a question of fact for the jury, not a question of law to be resolved on summary judgment. *See Faya*, 329 Md. at 460, 620 A.2d at 339 ("The existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered."). Accordingly, I will deny Meritus's motion for summary judgment on the issue of actual authority.

*Apparent Authority*

Under the equitable doctrine of apparent authority, a principal will be bound by the acts of a person purporting to act for him when "'the words or conduct of the principal cause the third party to believe that the principal consents to or has authorized the conduct of the agent.'" *Jackson*, *supra*, 180 Md. App. at 566, 952 A.2d at 322 (quoting *Johns Hopkins University v. Ritter*, 114 Md. App. 77, 96, 689 A.2d 91, 96 (1996)); *see Klein v. Weiss*, 284 Md. 36, 61, 395 A.2d 126, 140 (1978); *Parker v. Junior Press Printing Service*, 266 Md. 721, 727–28, 296 A.2d

377, 380–81 (1972); *B.P. Oil Corp. v. Mabe*, 279 Md. 632, 643, 370 A.2d 554, 560–61 (1977);

*Reserve Ins. Co. v. Duckett,* 240 Md. 591, 600–01, 214 A.2d 754, 759–60 (1965).

In medical negligence cases, Maryland courts have endorsed the apparent authority theory of the Restatement (Second) of Agency § 267, which provides:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care and skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*See Mehlman v. Powell,* 281 Md. 269, 273, 378 A.2d 1121 (1977); *Nelson v. Debbas*, 160 Md. App. 194, 210, 862 A.2d 1083, 1092 (2004), *aff'd*, 389 Md. 364, 885 A.2d 802 (2005); *Hunt*, *supra*, 121 Md. App. at 547, 710 A.2d at 377.

In order to impute Dr. Salvagno's alleged negligence to Meritus on a theory of apparent authority, plaintiffs must show that (1) they were misled by Meritus into believing that Dr. Salvagno was an employee of Meritus; (2) their belief was objectively reasonable under all the circumstances; and (3) they relied on the existence of that relationship in making the decision to entrust Dr. Salvagno with N.R.J-L's care. *Chevron, U.S.A., Inc. v. Lesch*, 319 Md. 25, 34-35, 570 A.2d 840, 845 (1990). This test has both objective and subjective elements; it requires plaintiffs to show that they subjectively believed an agency relationship existed, and it requires them to show that their subjective belief was reasonable. *See id.* Moreover, they must show that they relied on the existence of an agency relationship in entrusting N.R.J-L's medical care to Salvagno. *See id.*

As to the subjective element, Lopez-Krist and N.R.J-L submitted affidavits expressing their belief that Dr. Salvagno was an employee of Meritus. *See* Lopez-Krist Aff. ¶¶ 8, 10–11; N.R.J-L Aff. ¶¶ 5–7. With respect to reliance, plaintiffs' affidavits do not expressly state that

they relied on the existence of an employment relationship in consenting to Dr. Salvagno's treatment of the minor. However, as the Maryland Court of Appeals noted in *Mehlman*, 281 Md. at 274, 378 A.2d at 1124, hospitals are "engaged in the business of providing health care services. One enters a hospital for no other reason. When [plaintiff] made the decision to go to [the hospital], he obviously desired medical services and equally obviously was relying on [the hospital] to provide them."

The parties focus largely on the objective reasonableness of plaintiffs' belief that Dr. Salvagno was an agent of Meritus. Plaintiffs cite to three Maryland cases in support of their argument for summary judgment.

In *Mehlman*, 281 Md. 269, 378 A.2d 1121, the plaintiff had been taken to the emergency room of a hospital, unaware that the emergency room was operated by an independent contractor. *Id.* at 272, 378 A.2d at 1123. A physician in the emergency room misread an electrocardiogram, which led to the plaintiff's death. *Id.* at 271, 378 A.2d at 1122. After the jury held the defendant hospital vicariously liable for the physician's negligence, the hospital appealed the trial court's denial of its motion for a directed verdict. *Id.*, 378 A.2d at 1122. The Court of Appeals upheld the jury verdict, noting that "all appearances suggest and all ordinary expectations would be that the Hospital emergency room, physically a part of the Hospital, was in fact an integral part of the institution." *Id.* at 274, 378 A.2d at 1124. The court also noted that when the plaintiff "made the decision to go to [the] Hospital, he obviously desired medical services and equally obviously was relying on [the] Hospital to provide them." *Id.*, 378 A.2d at 1124.

In *Hunt*, 121 Md. App. 516, 710 A.2d 362, the plaintiff was exposed to thirty-two sessions of radiation treatment after a physician negligently misdiagnosed him with prostate cancer. *Id.* at 521–22, 710 A.2d at 365. The plaintiff subsequently filed a negligence action against the physician and a medical center, alleging that the physician was an agent of the medical center. The court reversed the trial court's grant of summary judgment to the medical center, noting that the plaintiff "could properly assume that the doctors and staff of [the medical center] were acting on behalf of [the medical center]. He is not necessarily bound by the limitations that may be contained in a private contract between [the medical center] and the pathology department." *Id.* at 548, 710 A.2d at 377–78. Citing *Mehlman*, the court held that "the issue of apparent authority should be determined by a jury." *Id.* at 548, 710 A.2d at 378.

In *Debbas*, 160 Md. App. 194, 862 A.2d 1083, the plaintiffs claimed that a physician negligently waited too long to perform surgery on the decedent, which led to her death. *Id.* at 198–99, 862 A.2d at 1086. Plaintiffs filed suit against both the physician and the hospital, relying on a theory of apparent authority to support vicarious liability. The trial court granted summary judgment to the hospital. On appeal, the Maryland Court of Special Appeals placed weight on the fact that the medical consent form signed by the decedent did not put him on notice that his treating physician was an independent contractor rather than an employee of the hospital. *Id.* at 212, 862 A.2d at 1093. The consent form read: "I hereby voluntarily consent to such diagnostic procedures and hospital care and to such therapeutic treatment *by doctors of the medical staff of Fort Washington Hospital . . . .*" *Id.*, 862 A.2d at 1093 (emphasis in *Debbas*). Holding that "the evidence of record is sufficient to create a genuine dispute of material fact on the issue of apparent authority and vicarious liability," the court reversed the trial court's grant of

summary judgment.  *Id.* at 213, 862 A.2d at 1094.  The court reasoned:  "It would be absurd to expect that an emergency room patient, with no particular sophistication about the operation and management of hospitals or medical clinics, should inquire into who is, and who is not, an employee of the institution, rather than an independent contractor."  *Id.* at 211–12, 862 A.2d at 1093.

Plaintiffs maintain that these three cases are sufficiently analogous to the case *sub judice* to warrant summary judgment for the plaintiffs, while Meritus insists that each case is distinguishable.  Regarding *Mehlman* and *Hunt*, defendant observes that the patients in those cases affirmatively chose to seek treatment at the defendant hospitals, whereas N.R.J-L was only treated at the Hospital because an ambulance drove him there.  *See* Meritus Memo at 13–14.  According to defendants, plaintiffs' lack of choice as to which hospital treated N.R.J-L undermines their claim of reliance.  *Id.*  Moreover, Meritus attempts to distinguish *Mehlman* and *Hunt* on the ground that the doctors in those cases worked full-time at the defendant hospitals, whereas Dr. Salvagno works primarily from a private office.  *Id.* at 14.  Regarding *Debbas*, defendants note that, unlike the consent form in *Debbas*, the consent form that Lopez-Krist signed did not expressly state that Dr. Salvagno was an employee of or on the staff of the Hospital.  Meritus Opp. at 5.

In my view, both parties miss the mark.  Even if this matter were controlled by the cases upon which plaintiff relies, none of those cases establish that a plaintiff is entitled to summary judgment on the question of apparent authority.  Rather, *Hunt* and *Debbas* hold only that the question of apparent authority is one for the jury, and *Mehlman* simply upheld a jury's finding of

apparent authority.  They do not support an entry of summary judgment on the question of apparent authority; they support the submission of that question to the jury.

Plaintiffs note that Dr. Salvagno was paged via an intrahospital paging system, *see* Lee Dep. at 40–42, that Dr. Salvagno arrived at the Hospital shortly after being paged, *see* Salvagno Dep. at 73–74, 80, and that there were no signs or notices at Meritus informing patients that their treating physicians may be independent contractors, *see* Lee Dep. at 18.  In addition, they point to the emergency room's location within the physical boundary of the hospital, *cf. Mehlman*, 281 Md. at 274, 378 A.2d at 1124; the letterhead and logo on the Consent form signed by Lopez-Krist, *cf. Debbas*, 160 Md. App. at 212, 862 A.2d at 1093; and the failure of both Meritus and Dr. Salvagno to clarify the contours of their professional relationship, *cf. Hunt*, 121 Md. App. at 548, 710 A.2d at 377–78.  To be sure, on this basis, plaintiffs have produced sufficient evidence from which a jury could find the existence of apparent authority.  However, such a finding would not be compelled.  "When legally sufficient evidence is produced of an agency relationship, the question of the existence of the agency relationship is a factual matter and must be submitted to the jury.  *Faya*, 329 Md. at 460, 620 A.2d at 339 ("The existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered."); *accord H & R Block, Inc.*, 355 Md. at 504, 735 A.2d at 1048; *P. Flanigan & Sons*, 251 Md. at 653, 248 A.2d at 476 (declaring that the existence of an agency relationship is ordinarily a question of fact); *Levine*, 141 Md. at 343, 118 A. at 800 ("[I]t is not for the court to determine the question of agency *vel non*, but if the testimony as to the fact of the agency tends to prove the existence of that relation, it should be submitted to the jury, who are the exclusive judges of its weight.").

Accordingly, I will deny the cross-motions for summary judgment on the question of apparent authority.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment are denied. A separate Order, consistent with this Memorandum Opinion, follows.

Date: October 17, 2013

_____/s/_____
Ellen L. Hollander
United States District Judge